UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Donna D. Banks-Bey,** | ) | **CASE NO. 1:09 CV 1249** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Acxiom, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

### Introduction

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 43)[1]. This case arises out of the termination of plaintiffs' employment. For the following reasons, the motion is GRANTED.

### Facts

Plaintiff, Donna D. Banks-Bey, proceeding *pro se,* filed this Complaint against

---

[1] Defendants also filed a Motion to Strike or Otherwise Disregard Plaintiff's Sur-Reply Memorandum (Doc. 47). The motion is granted as plaintiff's "Reply Memorandum" (Doc. 46) is actually a sur-reply brief filed without leave of Court. Notwithstanding, given that plaintiff is *pro se,* the Court has reviewed the sur-reply brief and finds that it does not alter the outcome reached herein.

defendants, Acxiom Corporation (hereafter, Acxiom), Christina Basmagy, Karan Caraballo, Bob Campbell, Sheryl Toth, and Lynette Whitney (collectively, defendants).

Plaintiff's Complaint originally set forth 13 claims. By Memorandum of Opinion and Order, this Court *sua sponte* dismissed Count Two (the § 1983 claim).  Defendants then moved to dismiss Counts Three, Seven, Nine, Ten, Eleven, Twelve, and Thirteen, as well as Counts One and Four against the individual defendants.  This Court granted the motion except as to Count Seven pending evidence of the EEOC charge.

Count Seven alleged retaliation under 18 U.S.C. § 1512(b)(2)(B) which this Court determined failed to state a claim as that statute does not give rise to a private right of action. Defendants had argued that to the extent plaintiff was attempting to assert a retaliation claim under Title VII, she did not exhaust her administrative remedies by filing an EEOC charge as to this claim.  At that point, the Court did not have a copy of the EEOC charge filed by plaintiff.  This Court now has a copy of the charge which does not assert retaliation. (Doc. 42 Ex. PP) Rather, plaintiff indicated that her termination was based on age and race. Plaintiff did not "check off" the box marked "retaliation." Nor did the narrative portion of plaintiff's EEOC charge contain reference to retaliation so as to put defendants or the EEOC on notice that she was alleging retaliation.  Therefore, even assuming in an abundance of caution that plaintiff alleged Title VII retaliation (which she did not), the claim is barred for failure to exhaust administrative remedies.  *See Younis v. Pinnacle Airlines, Inc.,* - F.3d-, 2010 WL 2595076 (6th Cir. June 30, 2010) (citations omitted) ("As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge.")

Accordingly, the claims remaining are Count One as to Acxiom (implied contract),

Count Four as to Acxiom (Title VII race discrimination), Count Five as to all defendants (race discrimination under Ohio law), Count Six as to all defendants (race discrimination under § 1981), and Count Eight as to all defendants (disparate treatment under § 1981).

Plaintiff, who is Black, was hired by Acxiom in March 2006 as a Customer Fulfillment Specialist.  (pltf. depo. 17, 19)[2] Customer Fulfillment Specialists call former employers, educational institutions, and other contacts to verify the information in employment applications.  (Sheryl Toth decl.)  Plaintiff was first interviewed by Karen Caraballo, Human Resources Manager, and Lynette Whitney, Verifications Department Supervisor, who both recommended that she be interviewed by Sheryl Toth, Manager of Verifications and Data Entry.  (Karen Caraballo decl.) Toth made the final decision to hire plaintiff.  Although plaintiff had no prior experience as a Customer Fulfillment Specialist, Toth believed that she had the ability to perform the job.  (Toth decl.)  Whitney was plaintiff's direct supervisor.  (pltf. depo. 19) Whitney reported to Toth.  (Whitney decl.)

As a Customer Fulfillment Specialist, plaintiff was required to make at least 12 calls per hour to verify information and "complete" (i.e., obtain all the necessary information for) 5.1 services (referred to as "completes" or "jobs") per hour.  Customer Fulfillment Specialists are required to maintain a high degree of accuracy in their work and must achieve an accuracy rating of at least 99.0%.  (*Id*.)

An Associate Quarterly Progress Appraisal, signed by plaintiff on July 5, 2006, states that in the first 90 days of her employment plaintiff had been "trained on all services in the

---

[2]  Plaintiff complains that defendants submit only portions of plaintiff's deposition transcript and that it should be submitted by defendants in its entirety.  The complete transcript with exhibits was filed by defendants, however.  (Doc. 42)

work queue." The appraisal states that plaintiff had no problem performing her job but that she needed to strive for a 99.0% accuracy as she was currently averaging 98.56% accuracy. (pltf. depo. 101-102; pltf. depo. Ex. C) By September 2006, plaintiff's accuracy rate was 98.76% and she was completing 4.32 calls per hour. (pltf. depo. Ex. E) Plaintiff's 2006 Annual Review, completed on October 18, 2006 by Sheryl Toth, indicates that plaintiff received a final performance rating of "developing" and a final scope rating of "does not meet expectations." Plaintiff was advised to "focus on increasing her completes per hour to 5.1" and "increasing her accuracy to a minimum of 99%." (*Id.* Ex. D)

According to Whitney, plaintiff's supervisor, plaintiff was trained when she was hired to perform the duties of her position but she did not meet the required production and accuracy measurements. Whitney met with plaintiff on December 28, 2006 and February 9, 2007, and offered to assist plaintiff to improve her performance. (Whitney decl.; pltf. depo. 176; pltf. depo. Ex. Z) As of the date of the earlier meeting, plaintiff had been "counseled" three times previously by Whitney about her production numbers. (*Id.*) Whitney's e-mail recapping the February meeting states that plaintiff "brought up" the following points: frustration with errors being given, frustration with the training plaintiff had received, the general attitude of the department, management's expectations of the associates, the possibility of work being lost, and "associates purposely changing information in templates to give other associates errors." Whitney concluded:

> As we talked about in our meeting, please let us know if you have any questions or do not understand a process or procedure. I also mentioned it may be helpful if you jotted down notes on anything in particular that you are having difficulty with. If you are questioning something, there is a good chance other associates are as well. I want you to keep working in the 24 hour queue but also let me know when you feel you are ready to tackle something new. We can then look at your production results together

and make the decision of when and where to start additional training.

(pltf. depo. Ex. W)

According to Toth, she and Whitney explained the job requirements to plaintiff throughout her employment and offered her additional training while suggesting that plaintiff sit with other associates to improve her understanding of the job.  Plaintiff was not receptive to the offer of additional training and was reluctant to sit with other associates for additional guidance on her job duties.  She never consistently met the required production standards of 99% accuracy and 5.1 jobs per hour.  Whitney and Toth spoke with plaintiff multiple times to help train and coach her on how to improve her performance, but failed to see noticeable improvement in plaintiff's production statistics.  (Toth decl.)

Plaintiff took a brief leave of absence in January 2007.  Upon her return, she was offered additional training to help her transition back to work.  Toth does not recall whether plaintiff accepted the offer of additional training.  (*Id.*)

In January 2007, plaintiff averaged a 98.28% accuracy and 3.35 jobs per hour.  In February 2007, plaintiff averaged a 95.50% accuracy and 4.38 jobs per hour.  (pltf. depo. Ex. E)

Plaintiff's February 28, 2007 Quarterly Review states that while she was "eager to learn," plaintiff needed to focus in the future on the following areas:  "high occurrences of errors, low performer, and teamwork."  Plaintiff received a "C" rating.  Whitney offered to meet with plaintiff monthly to help improve her performance.  Monthly meetings then began. (pltf. depo. Ex. O; Whitney decl.)

In March 2007, plaintiff's accuracy rate was 98.84% and she completed 4.29 jobs per

hour.  (pltf. depo.Ex. E)

Because plaintiff's performance failed to noticeably improve in the first few months of 2007, Whitney and Toth approached Caraballo to suggest placing plaintiff on an Associate improvement Plan (AIP).  An AIP is used as a formal tool to help increase an associate's performance.  The managers explained their concerns about plaintiff's performance to Caraballo and showed her plaintiff's production and accuracy statistics.  Caraballo drafted the AIP upon concurring that one was appropriate.  Whitney, Caraballo, and Toth presented the AIP to plaintiff in April 2007, reading and discussing its provisions with her.  (Toth decl.; Whitney decl.)

According to Caraballo, she deemed the AIP appropriate based on plaintiff's production numbers and the prior counseling she had received from Toth and Whitney.  Caraballo consulted with Debbie Arbuckle from the corporate office, who concurred with the decision to place plaintiff on an AIP based upon her prior performance.  An AIP documents the associate's deficiencies in his or her specific job role and gives clearly defined objectives for the employee to obtain.  Under an AIP, the associate is given a specified length of time, usually 30 days, to improve his performance.  If the associate's performance improves during the AIP, the associate is considered to have successfully completed the plan and remains employed.  If the associate does not complete the terms of the AIP, i.e., does not improve, the employee faces further discipline, including termination.  (Caraballo decl.)

Plaintiff's AIP, dated April 13, 2007, states, "The purpose of this document is to identify and target for improvement certain effectiveness categories in which you are currently working below expected standards.  Your primary weakness ... is in the

Performance category." The AIP identifies plaintiff's January 2007 through March 2007 performance statistics as areas of unsatisfactory work.  The AIP lists as "steps associate must take to improve" the following:

- schedule some time with your trainer to learn tips on how to increase production

- revisit using training tools- observe seasoned associate on best practices, pick up helpful hints to increase production level

- if you are unsure or have questions please ask Lynette or Sheryl

The AIP then lists "measurement methods" as:

- For the duration of the Improvement plan you must meet at least the minimum if not more the department standard of 99.0% accuracy with 5.1 completes per hour and process a minimum of 12 services per hour.  This will be the measurement for success.

- You are responsible for initiating weekly meetings with your supervisor Lynette Whitney to receive feedback on your performance and weekly stats.

Plaintiff was warned that if her performance did not improve she could be terminated.   (pltf. depo. Ex. F)

According to Whitney, she, Toth, and Caraballo read the AIP to plaintiff and discussed its requirements and the fact that any improved performance must continue after the conclusion of the plan.  Whitney states that she was always available for weekly meetings with plaintiff to discuss plaintiff's performance and address any concerns plaintiff may have had.  (Whitney decl.)

At the start of the AIP, Toth told plaintiff to sit with Judy Ford, another Customer Fulfillment Specialist, in order to "observe her best practices" and then to let the managers know "what you pick up and are able to implement into your calling." When asked whether she wanted to sit with anyone else, plaintiff responded that she would only if it was

7

mandatory under the AIP. In an email, plaintiff told Toth, "In reality I would like to get trained on some services that I may be able to implement into my daily work. If that is not feasible then I do not know who else to sit with at this time." Toth responded by asking plaintiff, "What services do you not know how to call on? We will make sure you are trained on how to call on all services." Plaintiff, however, did not request any specific further training. (pltf. depo. Ex. R; pltf. depo. 152-157).

During the AIP, plaintiff's performance improved and Toth decided that she had successfully completed the plan. (Whitney decl.) According to Toth, for the week ending April 21, plaintiff had a 100% accuracy rate, with 5 completes per hour, and a rate of 10.03 calls per hour. For the week ending April 28, plaintiff again had a 100% accuracy rate, with 6.11 completes per hour, and a rate of 10.73 calls per hour. For the week ending May 5, plaintiff had an accuracy rate of 98.28%, 4.90 completes per hour, and a rate of 9.17 calls per hour. For the week ending May 12, plaintiff had a 99.21% accuracy rate, 6.43 completes per hour, and 11.22 calls per hour. (Toth decl.).

Shortly after the successful completion of the AIP, however, plaintiff's performance began to decline. (Toth decl.; Whitney decl.) Toth shows the following figures:

| Week ending | Accuracy | Completes | Calls per hour |
| --- | --- | --- | --- |
| May 19 | 98.59% | 4.81 | 9.03 |
| May 26 | 100% | 2.67 | 11.51 |
| June 2 | 100% | 3.16 | 10.91 |
| June 9 | 98.53% | 3.48 | 10.24 |

| | | | |
|---|---|---|---|
| June 16 | 97.5% | 3.97 | 9.56 |
| June 23 | 100% | 3.27 | 9.85 |
| June 30 | 98.07% | 3.40 | 10.13 |
| July 7 | 97.75% | 4.84 | 11.1 |
| July 14 | 98.16% | 4.67 | 10 |
| July 21 | 98.75% | 3.64 | 11.87 |

(Toth decl.)

Whitney met with plaintiff in May and June to review her performance, but there was no noticeable improvement. In July 2007, Whitney approached Toth with her concerns regarding plaintiff's performance and her inability to continuously meet the production and accuracy standards. Toth agreed that plaintiff's performance was poor. (Whitney decl.)

Toth made the decision to terminate plaintiff's employment. In July 2007, Toth approached Caraballo about the possibility of terminating plaintiff. Toth reviewed plaintiff's production numbers with Caraballo and the latter agreed that termination was appropriate under the circumstances. (Toth decl.; Caraballo decl.) Caraballo consulted with Arbuckle regarding the termination. Arbuckle concurred based on plaintiff's continued failure to meet her production standards. Plaintiff was terminated effective July 19, 2007. (Caraballo decl.)

This matter is before the Court upon defendants' Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*,

8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Discussion

### (1) Race Discrimination

Plaintiff asserts race discrimination under Title VII (Count Four), the Ohio Revised Code (Count Five), and § 1981 (Counts Six and Eight).  The claims are all analyzed in the same manner.  *Gibson v. Shelly Co.,* 314 Fed.Appx. 760 (6th Cir. 2008) (citing *Noble v. Brinker Int'l, Inc*., 391 F.3d 715, 720 (6th Cir.2004) ) (Plaintiff's claims of race discrimination under Title VII, § 1981, and Ohio Rev.Code § 4112.02 were all considered under the same burden-shifting approach and judicial standard of review applied in Title VII cases.)

Plaintiff may prove that she was subject to disparate treatment based on race in violation of Title VII using either direct or circumstantial evidence. Where, as here, there is no direct evidence of discrimination, the plaintiff's circumstantial evidence is analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Plaintiff must first demonstrate a prima facie case of race discrimination.  The burden then shifts to defendants to offer a legitimate, non-discriminatory explanation for plaintiff's termination.  Finally, the burden shifts back to the plaintiff to show pretext, i.e., that defendants' explanation was fabricated to conceal an

illegal motive.

To state a prima facie case for racial discrimination, plaintiff must show that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.  *Mullins v. U.S. Bank*, 296 Fed. Appx. 521 (6th Cir. 2008) (citing *Wright v. Murray Guard, Inc*., 455 F.3d 702, 707 (6th Cir.2006) and *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir.2004)).  If the prima facie case is satisfied, defendants provide a legitimate, non-discriminatory reason for plaintiff's termination.  Once defendants do so, plaintiff must prove pretext by showing either that (1) the proffered reasons had no basis in fact; (2) the proffered reasons did not actually motivate the action; or (3) they were insufficient to motivate the action.  *Id.* (citing *Kocsis v. Multi-Care Mgmt*., 97 F.3d 876, 883 (6th Cir.1996) and *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)).[3]

Defendants argue that plaintiff cannot establish a prima facie case.  In this regard, defendants dispute only that plaintiff was treated differently than similarly-situated non-

---

[3] Plaintiff makes references to a hostile work environment.  Plaintiff, however, did not allege such a claim.  Even if she did, the claim is barred for failure to exhaust administrative remedies (as discussed above with regard to retaliation).  Plaintiff's EEOC charge challenged only her termination: "On July 19, 2007, I was informed ... that I was terminated for poor performance, low production.  I am aware of similarly situated White younger coworkers who were not treated in this manner.  I believe I was discharged because of my race, Black, ... and my age, 58,..." Plaintiff also stated on the charge, "earliest date discrimination took place- 7-19-2007" and "latest date discrimination took place- 7-19-2007." Additionally, plaintiff did not "check off" the box indicating "continuing action." Nor did the narrative portion of plaintiff's EEOC charge contain reference to a hostile work environment so as to put defendants or the EEOC on notice that she was alleging such a claim.  (Doc. 42 Ex. PP)

12

protected employees.

To establish that an employee is similarly situated to her, plaintiff must demonstrate that she is similarly situated to the claimed comparator in all relevant respects. *Perkins v. Harvey*, 2010 WL 785917 (6th Cir. March 9, 2010) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir.1998) ).  Plaintiff does not demonstrate that certain non-protected employees who "dealt with the same supervisor, [were] subject[ed] to the same standards, and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [defendants'] treatment of them for it" were treated differently.  *Johnson v. Interstate Brands Corp.,* 351 Fed.Appx. 36 (6th Cir. 2009) (citing *Ercegovich*, *supra*). Nevertheless, the Court will address plaintiff's assertions.

Plaintiff states, without evidentiary support, that throughout her employment she was assigned accounts and clients for which she had not received the standard training which was afforded to White associates.  Plaintiff also contends that non-protected employees were trained on "all services" during their 30 day probationary period, while plaintiff was not so trained.  In support of this assertion, plaintiff points to her Exhibit B.

The documents plaintiff submits as Exhibit B, however, are not authenticated by affidavit or otherwise.   The Sixth Circuit has "repeatedly emphasized that unauthenticated documents do not meet the requirements of Rule 56(e)."  *David A. Flynn, Inc. v. General Motors Acceptance Corporation*, 345 Fed. Appx. 974 (6th Cir. 2009) (citing *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 532 n. 5 (6th Cir.2002) and *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir.1993) ("This court has ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e);

otherwise, they must be disregarded.") ; *Alexander v. CareSource,* 576 F.3d 551 (6th Cir. 2009) ("Evidence submitted in opposition to a motion for summary judgment must be admissible... [and it is] this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).")

Even considering this evidence, plaintiff has not demonstrated that non-protected employees received more training during their initial probationary period than plaintiff did. Plaintiff submits the Associate Quarterly Progress Appraisal of three (presumably non-protected) employees and herself.  But, the documents show that all the employees, including plaintiff, were "trained on all services in the work queue."  (Doc. 44 Ex. B) Additionally, while plaintiff testified that White employees received training that she did not receive, plaintiff admitted that she had no personal knowledge of the training received by these associates.  (pltf. depo. 70-72) Moreover, plaintiff testified that one Black employee hired after plaintiff received training that plaintiff did not receive given that there was a "new implementation for a new type of training."  (*Id.* 72-73)

Also submitted as Exhibit B is a handwritten note, presumably written by plaintiff to another employee:

> -Marcita- Durden "over"
> This is confidential: 7/2007
> I've been here over a year, constantly asking for updates and training.  What is your opinion on this?  I appreciate your feed-back.

The employee responded:

> Donna,
> I would stay on them regarding the addition [sic] training therefore they can not use any of this against you. They never train people the way they should or make sure we understand the changes that they constantly make.

14

If anything, the handwritten note shows that no one, including non-protected employees, received sufficient training.

Plaintiff asserts, but without evidentiary support, that non-minorities were mentored and constantly given additional considerations while plaintiff was denied further employment benefits which were afforded to those not of the protected class.  Plaintiff contends that she was denied overtime, presumably while non-protected employees were afforded overtime.  Plaintiff points to her Exhibit C.  This evidence shows, however, that plaintiff was denied overtime because she was not meeting her production numbers.  Defendants' evidentiary support further shows that plaintiff was told that she could not work overtime because her production goals were not being met. (pltf. depo. Exs. T, V) Moreover, plaintiff admitted at deposition that she did work overtime, but just prior to her termination she was denied overtime based on her production.  (pltf. depo. 159)

Finally, plaintiff contends that employees who were not members of the protected class had high amounts of errors and problems with their production, as well as high instances of absenteeism and tardiness and yet were given favorable treatment and friendly assistance which included training.  Plaintiff, however, offers no admissible evidence in support of this contention.  Plaintiff asserts that White employees Tina Anagnostopoulos and David Reeves were awarded with additional training and neither was placed on an Action Improvement Plan although they received a C rating on their evaluations.  Plaintiff, however, testified that she had no knowledge of what training Anagnostopoulos or Reeves received that she did not receive.  (pltf. depo. 70) Additionally, even assuming either of these employees engaged in the same conduct as plaintiff (i.e., consistently low production numbers) and were not placed

on an Action Improvement Plan, plaintiff successfully completed her plan and was terminated later based on failure to meet production numbers.

On this basis, plaintiff fails to demonstrate that similarly-situated non-protected employees were treated more favorably than plaintiff. Plaintiff asserts, "It is necessary for Defendants to prove that the Plaintiff received the same training as the non-minorities and that Plaintiff had the ability to perform the work with the same capacity and expertise of knowledge that was afforded the non-minority associates." (Doc. 44 at 5) And, "The Defendants have failed to prove that the Plaintiff was impartially treated and afforded employee considerations as were afforded other non-minorities not of a protected class." (*Id.* at 18) Of course, it is plaintiff's burden to show that the prima facie showing is established. *See Peltier v. United States,* 388 F.3d 984 (6th Cir. 2004). In fact, "throughout [the *McDonnell Douglas*] burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Corell v. CSX Transp., Inc.* 2010 WL 1994699 (6th Cir. May 19, 2010) (citing *Wright v. Murray Guard, Inc.,* 455 F.3d 702 (6th Cir. 2006) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ).

For these reasons, plaintiff fails to demonstrate a prima facie case of race discrimination and her claims under Title VII, § 1981 and Ohio Rev.Code § 4112.02 fail. Even assuming she did show a prima facie case, plaintiff fails to demonstrate pretext.  As discussed above, defendants produce evidence that plaintiff was terminated because she failed to meet Acxiom's production standards.  While plaintiff's performance showed temporary improvement resulting in her successful completion of the AIP, her performance declined again shortly thereafter.

To show pretext, plaintiff must not only prove that defendants' reason for terminating her was false but that discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  Plaintiff does not specifically address pretext, but the Court will address her assertions which appear to relate to her burden in this regard.

While plaintiff does not dispute that her production fell below that required by the standards set forth by Acxion, she asserts that defendants falsified her work production log, altered her finished work, and denied her training.  Plaintiff points to her Exhibits D and E.  These documents, however, show that plaintiff disputed errors which were attributed to her on an Error Dispute Form provided by defendants and that she addressed the errors via email communication with her supervisor.  Plaintiff provides no evidence that defendants falsified her work production log or altered her finished work.  Nor, as discussed above, has plaintiff demonstrated that she was denied training afforded to White employees.

Plaintiff asserts that the racially derogatory word "mammy" appeared on the computer's spell check system when plaintiff typed in a similar word and that although she brought this to defendants' attention in January 2007, defendants did not promptly address this concern.

Toth states that after plaintiff complained to her about the word "mammy" in the spell check program, she consulted with Acxiom's IT department and learned that Acxiom did not have the ability to edit the spell check software.  (Toth decl.)  Plaintiff does not dispute this evidence and the Court does not find plaintiff's assertion to support the conclusion that discrimination was the true reason for plaintiff's termination.

Plaintiff contends that defendants accessed her "personal website" after she was

17

terminated. Without evidence, it is unclear as to what forms the factual basis of this assertion. Nevertheless, plaintiff asserts that it was meant to be retaliatory and a means of harassment. Assuming the truth of the assertion, the Court does not find it to be evidence of pretext in that it does not tend to show that the reason for plaintiff's termination, i.e., low productivity, did not truly motivate defendants' decision.

Plaintiff alludes to "institutionalized racism" and asserts that Acxiom had a very small percentage of Black employees at the relevant time. Whitney, Caraballo, and Toth participated in the decision to hire plaintiff and also to terminate her. Thus, plaintiff was terminated by the same individuals who had hired her less than 18 months earlier. While not required, this Court is permitted to infer a lack of discrimination from this fact. *See Mischer v. Erie Metro Housing Authority,* 168 Fed. Appx. 709 (6th Cir. 2006) (citations omitted) (discussing the "same-actor inference).

For the foregoing reasons, plaintiff fails to show pretext.

Because plaintiff fails to survive summary judgment on her race discrimination claims, her claims against the individual defendants likewise fail. *Hout v. City of Mansfield,* 550 F.Supp.2d 701 (N.D.Ohio. 2008) (citing *Booker v. Dee Sign Co.*, 2008 WL 839786 (S.D.Ohio March 26, 2008).

### (2) Implied Contract

Count One alleges breach of an implied contract as to Acxiom. While defendants moved for summary judgment on this claim, plaintiff fails to specifically address her breach of implied contract claim. For the uncontested reasons stated by defendants, summary judgment is proper on this claim.

18

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.

        /s/ Patricia A. Gaughan
        PATRICIA A. GAUGHAN
        United States District Judge

Dated: 8/9/10